call the case of Louise Harris versus the Alabama Department of Corrections. Good morning. Good morning, Your Honors, and may it please the Court, my name is Stuart Gold and I represent Louise Harris. I'm here today with my colleagues Marie Howick, who will handle the rebuttal part of the argument, and Christina Barriero. Our system of justice failed Louise Harris. The Alabama appellate courts recognized this ruling that Mrs. Harris was prejudiced in the ineffective assistance of her counsel during the penalty phase, and they vacated her death sentence. But the same aspects of prejudice that were present in the penalty phase are just as important in the guilt-innocent phase, and the stakes remain high, even after 29 years in prison. Without this relief and a new trial, Mrs. Harris will spend the rest of her life in prison, or her grandchildren, outside of prison. The jury in this case never learned that Mrs. Harris has a 77 IQ and a reading level at fifth grade. She's got a repeated history of being the victim of domestic abuse, including threats by every one of her three husbands and her boyfriend, her co-defendant. That evidence was critical in order to counter the prosecution's theory of the case. For there to be a true adversarial testing of the prosecution's case, that had to be heard by the jury. The prosecution theory was that Louise Harris was the mastermind and driving force of a conspiracy to kill her husband. That she was able to understand, this is a person with a 77 IQ, understood the statutory language about being killed in the line of duty, that she planned an alibi, she tailored her testimony, and when she heard that her husband was dead, she, stone cold, just did not react. Mrs. Harris' trial attorneys, Mr. Bowen and Mr. Argo, provided no true adversarial testing of this case, which is the heart of what right to counsel means. You're supposed to have an effective attorney who challenges the prosecution's case. Mr. Gold, I like that argument, but can you help me figure out how it maps on to the continuity of counsel? This case is almost, I actually think of it as a constructive denial of counsel. It's a combination, really, of clearly established Gideon principles and Strickland principles. The system, I think this was a structural defect, the system made it so that Bowen and Argo could never do an effective job. They could never establish trust and confidence. The court dismissed the first two attorneys that were appointed, Halstrom and Riggs. They didn't want to be relieved. They wanted to stay and fight, including challenging the Alabama statute. The judge said, nope, I'm going to treat this as a motion to be recused or excused. You're out. Then we have four lawyers appointed in fairly rapid succession. I think Mrs. Harris did not meet with those four. She knew that new counsel had been assigned. She wasn't present when Riggs and Halstrom were relieved. Then a combination of the court not realizing it and the bar list mistake. Two attorneys were appointed, and only on the eve of trial did the court realize, because the lawyers finally realized and raised, that neither of them had the criminal experience to try this case. And you're supposed to, under the statute, have at least one lawyer with five years of criminal experience. Now the system put these two lawyers in, and I understand it was partially the judge, but also the bar supplies the list. And you'll see in the record there's a discussion about getting the bar to give him, to give the court somebody who had the experience. And in comes Bowen, three months before trial. And he's expected, he's the one with the criminal experience. Argo and Bowen would never be able to create the relationship of trust and confidence required to get the story. Does that mean that there could never have been a conviction in this case? No, absolutely not, your honor. So you just said, though, they could never be effective. Yes, and what should happen here, your honor, was... What happens if you get to that situation where, for whatever reason, illness, just you want to get out, you've gone through two or three, four attorneys, and in your theory then you can never appoint an effective attorney. No, that's not true, your honor. I thought that's what you just said. No, these two lawyers, in these circumstances, with this defendant, could never be effective. What should have happened was basically like a mistrial. This should have been a reset. They should have blown the trial date, just taken it off the calendar, asked Mr. Bowen and Argo to start to try and have a relationship with Mrs. Harris. Mr. Bowen only spent three hours with her. I'm not saying it's his fault, because he's got three months, he's got to practice, he's got a large... Counsel, it sounds like what you're really arguing is that they just didn't have enough time, in which case they should have asked for a continuance. They should have, but they should have asked for what I would call a reset. Start to build a relationship, come back to the court, and then set a trial date that made sense. If that had happened here, I think we would be relegated to this pure Strickland standard, not a structural problem. Even if you view this more Strickland than Gideon, we've demonstrated the extreme prejudice that was provided here. But in these circumstances, a severely abused woman with a 77 IQ is passed around among nine men as her lawyers. Why would she open up to them? In light of the sequence with Bowen at the last minute coming on, to her mind, it's like you may be here a little while. But I thought the last counsel simply didn't try to meet with her. Isn't that the case? No, he didn't. Just for a few hours. He only met for three hours, but he had to get up to speed. There was a lot to do to get ready for this trial, and these people have other practices, but there was no way for him to know the full story and that he didn't have enough time to get it out. What happened at the trial is the best demonstration. Now, had there been a reset and given enough time, then we would be in Strickland, and maybe they wouldn't have gotten it out of her. The system set it up here because after a while, I think she was still feeling the effect of being told one after another, this attorney shows up, Knox Argo is with her, he handled it up till Bowen, then all of a sudden Argo left in terms of preparing Louise and dealing with her, and Bowen comes on. Even more interesting, Knox, I think the defense, in part because of this, imploded it in some ways. Knox Argo put Louise on the stand, which was a devastating mistake. Here's a woman, if they had realized that she had a 77 IQ, you would not put her on the stand. When she went on the stand, she basically imploded and helped the case more than anything. This was generally a fairly weak case. The state, in terms of evidence, had the co-conspirator, Mr. McCarter, who had a deal in exchange for his testimony, and Alonzo Trimble, who was the corroboration. He kept changing his story. It was a fairly weak case until Louise got on the stand, and then there was a very effective closing where the prosecution said, she's the mastermind. She even had all the state's evidence, and she tailored her testimony in a way to meet the state's evidence. That's not something... Yes. I guess the problem I'm having conceptualizing your argument is that you're asking for some kind of a free-floating, if you have enough, if there's a number of different attorneys pointed that this is some sort of free-floating cause. But at some point, you have to peg it to some prejudice, like you mentioned. You called a reset, as Judge Pryor said. It's like, should they have asked for a continuance? Should they have spent more time with her? Should they have not put her on the stand? At some point, you have to tie it to something, and in this case, most of those have already been adjudicated against you, haven't they? Yes, under the Strickland standard. Here, under the Gideon case and Strickland, you apply the general principles on a case-by-case basis. You don't have to come up with a general precedent. In this case, sometimes nine attorneys might work. I frankly don't think if you get nine different appointed attorneys that you're really having effective counsel, but conceivably, it could work. But applying those principles to this defendant, with a 77 IQ and a story of abuse, how could those lawyers meet the prosecution's theory? There was no real testing. You have to decide whether you can read this record and feel that the result was reliable. And I submit, in this case— Counsel, you haven't pled that any specific strategy was lost as a result of the turnover of the counsel. Am I right about that? There's no strategy here. As they found in the penalty phase, if you do not know the facts of Louise Harris' history of abuse and her IQ and what she went through, they said that's neither a strategy nor reasonable. I don't know what the difference is here in terms of the prejudice. Well, I think you could have a—maybe you could have a continuity of counsel claim if, for example, the first counsel decided to pursue some defense. That counsel goes quickly. Another counsel comes in and says, well, I'm going to pursue an innocence defense. Another counsel comes in, I'm going to pursue a different strategy. And then the final counsel is sort of at a loss, doesn't have time. But you haven't pled anything like that here, have you? Yes. Yes. The strategy—the lack of strategy here, their decision, they could not do an effective job and meet the prosecution case because they did not have a chance to bond with Louise as the ABA standards require and the courts say you're entitled to. So they could get the full story. Without the full story, to meet the—listen, this woman's reaction when she was told her husband was dead is a reaction of a woman who's suffering from PTSD, battered woman syndrome. If they had known that she had been abused by all of her husbands, she didn't kill her first two husbands. They abused her mercilessly. One of them ultimately killed his second wife. The jury never heard that all they heard—or I should say they actually did hear that her husband beat her because it came out. But Bowen and Argo said they didn't want to use the abuse of her husband because it might give a motive. And standing alone, I think that was the wrong decision, but I could understand that. But if they had known that she had been abused by at least three other men and she didn't kill them, putting it in context for the jury as to why she reacted the way she did and knowing that what her mental abilities were, the notion that she was the mastermind of this, just that strategy might have worked. It certainly is—should give you pause that this was a reliable result. Thank you, Mr. Gold. Thank you, Your Honors. Good morning. Good morning. May it please the Court, my name is John Porter and I represent the respondents in this case, the Commissioner of the Alabama Department of Corrections and the Warden of Tutwiler Prison where Ms. Harris is incarcerated. Harris has made it clear in the past that she's not raising any kind of due process argument or any kind of esoteric argument that she was denied a relationship with her attorneys. In her brief, she made that clear by saying that distinguishing the Morris v. Slappy case. And now, really for the first time, she appears to be arguing that it's almost a chronic situation where there's a total breakdown of the adversarial system where in the chronic situation you don't have to prove prejudice. But in this case, the record totally belies that there's any kind of total breakdown of the adversarial system. And as Harris has pretty much argued through a brief, the Strickland v. Washington standard applies. And under that standard, there are two requirements that Harris has to show. First, that her attorney's deficient performance resulted in a lack of continuity of counsel. And secondly, that that deficient performance prejudiced her case to the extent that there's a reasonable probability that but for the deficient performance, the lack of continuity, the result of her trial would have been different. We have to admit, I mean, this large number of counsel is not ideal. Yes, Your Honor, and then especially in August of 1988 and September of 1988, there were between that period really just a little over a month, there were six attorneys that withdrew. Knox Argo was appointed more than, I think it was September 29th, 1988, which was more than nine months before trial. But he wasn't lead counsel. Well, he... Was he? Well, at the very level at that point was lead counsel, even though he, and they proceeded for six months until three months, more than three months before trial, and he realizes an Alabama statute saying that to be lead counsel, you have to have five years of criminal law experience. So they brought Bowen in. That's when they brought Bowen in. So... Three months before trial. Well, during this... Well, and during that, on the eve of that trial, Knox Argo said, we're ready for trial, but, you know, we have to bring in somebody new. So Bowen came in as lead counsel. He had a very, a lot of experience in criminal law in the Attorney General's Office, the District Attorney's Office, and private practice, and so he handled the motion practice. You know, what they say is he hardly knew his client. He spent very little time with her. Well, he spent, he documented three hours. There were some questions. Well, and Knox Argo documented ten hours, but he said that, you know, he only documented enough, you know, there's a cap on the amount he could be compensated for, so he only documented enough for that. What is that, by the way? I'm sorry? What would be the cap? Oh, I'm not aware of that. If you know. Yeah, I know. But I thought he actually documented well in excess of the cap, didn't he? I believe so, but there's, like I say, there's some discrepancy over whether that was his total amount. But the big problem is how he had nine months. He was our attorney for nine months. How did this, what Harris terms as a revolving door of attorneys, which almost completely occurs during August and September, more than nine months before trial. How does that cause, excuse me, how does that cause Argo to only spend ten hours or Bowen to only spend three hours? There's no causation between this, the revolving door of attorneys and how they, what they decided to spend with their clients. In nine months, Harris is. Are you saying it should have been brought as a, just a straight ineffective assistance and counsel claim? Well, I think the, I mean, Harris brought plenty of ineffective assistance and counsel claims. And that's what this continuity of counsel is, is a explanation for. It's not a deficient performance and there's Argo and Bowen. There's nothing in their record that shows that they did anything to, to cause a lack of continuity of counsel. They were the two that took on, once they took on their appointment, they represented her through the entire trial. Whether they didn't spend time with her, that's, that's not a lack of continuity. That's, that's just a straight ineffective assistance and counsel idea, right? Well, I mean, that not spending enough time may have caused them to not present some of this evidence. And Harris brought claims based on the attorney's failure to present evidence of abuse and evidence of Ms. Harris's low IQ. But there's no, the evidence of abuse was, in fact, Eric Bowen testified during his deposition that he actually brought up the subject of abuse and said, we can use this as a defense. Ms. Harris denied that she was an abused woman, said this had nothing to do with my husband's murder. So therefore, I don't want to bring, I don't want to get up on the stand or I don't want to have the evidence of abuse, which might even imply that there's a motive, especially if it's abuse from her husband, that would imply a motive to kill her husband, which she wanted to avoid that. Was, was, was, did, did they testify as to a strategy of defense? I mean, were they, you know, sometimes in a murder case, your strategy is try to get acquittal. Sometimes your strategy is to avoid the death penalty. Have they, did they have a specific strategy or what, what was their goal? It was basically that she had nothing to do with her husband's murder and that she was  What she did, and she has clarified that she's not using the evidence of abuse to show, certainly not a reason to kill her husband, but also not to excuse her killing her husband, but to show her curious reaction when she found out about her husband's death. But the testimony there, not, there was Santina Jenkins and Dorenda Hinton who worked for the Sheriff's Department, both testified that she showed, really, even though she was wringing her hands and yelling, she showed no tears. I think what is especially telling is Dorenda Hinton's testimony that when she asked her, you know, why aren't you showing any emotion? And she said, well, my husband was a big drinker and we fought all the time. And I'm in love with Lorenzo McCarter and he makes love to me better than anybody else. I don't think any, no kind of abuse would have, evidence of abuse could have explained that away. Though, first of all, it probably wouldn't be admissible if the battered woman syndrome back to the trial was around 1990. It was controversial even so far as to explain or to, you know, to justify an actual killing homicide. But their own expert, Dr. Loring, even said she was unaware of any case where the defendant denied any participation in a homicide and was trying to bring this evidence of abuse in battered woman syndrome. That was one question I had. There were two experts who testified who examined her post, during the post-conviction proceeding, right? Well, as far as, I believe, at least two. It was, and my question is, did either the state or any of these 11 defense counsel have her examined by any kind of mental health professional before trial? I'm not sure, not the one, not the experts during Rule 32. I understand that, but was there any other expert? Was there any testimony or any evidence that there was any type of mental health evaluation by anyone pre-trial? I'm not sure about, I have to check on that, Your Honor. But her low IQ, I mean, one thing, the whole, Harris is really emphasizing the evidence that she's got a low IQ and that she couldn't have, quote, masterminded this killing her husband, but we're not talking about a Ponzi scheme here. We're talking about, she asked her boyfriend, Lorenzo McCarter, to get Michael Sockwell and Alex Hood to go and kill her husband, and on the night of the murder, she communicated with a beeper and she actually gave them $100 and gave that to McCarter. But, you know, someone with an IQ of 77 could have planned all that out. Ms. Harris never got an evidentiary hearing on her continuity of counsel claim, right? Right. In fact, she did not even raise it in a Rule 32 petition. So she hasn't had a chance to develop a record on the effect of, specifically, of the continuity of counsel or lack thereof, I should say. Isn't that right? That's right. But she, in a Rule 32 petition, she included an introductory paragraph where she details this, her attorneys that represented her, and then when the State responded to a Rule 32, an abundance of caution, should this be an independent claim, it is without merit and it is precluded, it wasn't, could have been raised on trial. But then, in Harris's response to pleading, she said, no, this is not an independent claim, it's a, just an introductory paragraph, where we then, the trial court never made any ruling on the issue. Then, when her Rule 32 was appealed, the Court of Criminal Appeals mistakenly said that the trial court held it was barred under Rule 32.23a, which is basically it could have been raised at trial, it was not, which, you know, it was mistakenly. But we look, I mean, we look to that opinion, don't we? I mean. Right. And I, you know, that's why I addressed it, but as far as, you know, the Court of Criminal Appeals and Alibi Supreme Court then held the same way, that it was precluded under, because it could have been raised at trial, it was not. Procedural default. Procedural default. But they treated it as though it were a live issue. Did they treat it as the procedural default being that if there was a lack of continuity, that they should have asked for a continuance? What did they say was defaulted? They said it could have been raised at trial and was not. But it could have been raised at trial. The lack of continuity that, in fact, the Alabama Supreme Court had more of an opinion by saying that since Knox Argo had nine months and Eric Bowen had three months, which was you know, the revolving door of attorneys happened more than nine months before trial. So that was plenty of time to, should there have been, you know, any kind of deficient performance that they could have raised that. But if Bowen and Argo were part of this revolving door and lack of continuity, wouldn't they have had a conflict in raising this issue at trial? But there's no indication in the record that they, like I said, there's nothing that they lack of continuity of counsel. And on the other side of the coin, there's nothing in the record showing that this revolving door of attorneys affected the representation of Ms. Harris. And if, you know, they decided if they only spent ten hours or if they didn't present this evidence, there's no causation between any kind of lack of continuity. If they did have a conflict, would you agree that that would be cause to excuse the default? In other words, if they had to say that they were ineffective somehow. If they were alleging their own ineffectiveness, then certainly that would excuse the default. And if there are no more questions, I'll conclude my argument. And I respectfully ask this Court to affirm the denial of Ms. Harris' federal habeas petition. Thank you. Thank you. Good morning, Your Honors. May it please the Court, my name is Marie Howick. I think it's important to reiterate that the lack of continuity of counsel in this case made it so that the likelihood that counsel could have performed effectively was so remote that it rendered the trial unfair. Are you making a chronic argument that your co-counsel used the word structural error? That's chronic and it's evaluating Powell, which we talk about in our brief. And I think it's both. I think it's structural error because the system created the problem. They were the ones that appointed these nine different attorneys and made it so it was impossible for these attorneys to develop a relationship of trust and confidence, which is what the ABA says needs to happen, especially in death penalty cases. They made it so that couldn't happen. And so these vital, crucial parts of the defense weren't understood by the defense attorneys. It didn't come out. They didn't understand the complexity of what was going on. And so Gideon applies. It's a structural error, but you can also analyze it under Strickland because the continuity of counsel made it so that the performance was deficient. They weren't able to perform adequately. And clearly, Ms. Harris was very prejudiced as a result because the defense was not able to take on the prosecution's case-in-chief, and they could have. Go ahead. Well, you have to have cause and prejudice. So let's assume you get over the cause argument that there was the continuity issue. But the prejudice issues, arguments that you're making, have already been adjudicated against her, though. How do you get around that? Okay, a couple things. First, I think I should raise, since it was raised in the appellee's brief, that the procedural question here is whether or not counsel could have raised their ineffectiveness at trial. That's why it was dismissed on procedural grounds, that they should have raised it at trial. The federal question we're looking at right now is whether continuity of counsel made it, rendered that counsel ineffective such that they weren't able to raise it at trial. So I actually think that because the procedural question is bound up so closely in the federal question that it's not an independent ground for relief, giving the court leave to decide the claim on the merits without looking at cause and prejudice. But even if you do look at cause and prejudice, I think what happened in this case is that the prejudice was analyzed under a very pure Strickland standard, and they basically said, look, this was trial strategy, we can't touch that, and so we're denying those claims. But really, it wasn't trial strategy. What we're saying here is that the continuity of counsel, the lack of continuity of counsel, made it so that these attorneys didn't have the chance to ever develop a strategy. So it's not a strategy question. It's a question of whether or not submitting this defendant to nine different attorneys. In this particular case, where this woman who was so viciously abused by so many different men and had an IQ that was so incredibly low, in these circumstances, where you combine all of these facts, was counsel ineffective? So just assume that we accept deficient performance. Right. So how exactly was she prejudiced? Okay. And how does that flow from the continuity of counsel problem? So the lack of continuity of counsel prevented Ms. Harris from developing a relationship of trust and confidence with her attorneys. It prevented the attorneys from being able to meaningfully test, put the state's case to the adversarial test. The state's case was four things, that she masterminded the murder, that she strong-armed her boyfriend into committing the crime, that she did it for pecuniary gain, and that, by the way, if you look at how she reacted when her husband died, she's for sure guilty. If Ms. Harris had been able to have continuity of counsel such that she could develop a meaningful relationship, this woman who had to very clearly and effectively articulate complicated and painful facts that were directly relevant to this defense, it would have come out that she had a low IQ. It would have come out that she was abused by, that she was dominated by abusive men her whole life, by the rapist who raped her as a little girl, by her first husband who beat her when she was pregnant and she was only 16. I know. All these things. Extending your time, I hope that's all right. You've come a long way, so I'm going to keep you on your feet. So your opposing counsel says it's inconsistent to, on the one hand, say she had nothing to do with this murder, which was her defense, and on the other hand saying, well, she was horribly abused. What do you say about that? If you look at the motive in a vacuum, then I think that that makes sense. But what we're saying is these attorneys never got the chance to understand the real Louise Harris. And if they understood the real defendant, the defendant who was on trial for her life, they would have been able to analyze all these very important and crucial factors that they never got the chance to analyze. Just to follow up again, I apologize for keeping you long, but one of your prejudiced arguments is that she testified, and if she had had an effective relationship with her counsel, that wouldn't have happened. So do we have to assume that she would have been acquitted if she had not testified? How does that work? I think you have to assume that the results of her trial are unreliable because the State's case was not put to an adversarial test. And as a result, she deserves a new trial. All right. Thank you. Anything further for Ms. Howatt? No, thank you. Just a point of personal privilege here. We always look forward to hearing from the Solicitor General's Office in Alabama. You consistently do a good job. I hope your new Attorney General appreciates the resources. You can convey that to him if you would. And on the other side of the courtroom, how long has your law firm represented Ms. Harris? I've represented my firm. I'm retired, but we've represented Ms. Harris since 1993 as counsel and as counsel of the record since 1995. I have to tell you, it's just personally inspiring to me to see you all come in and step in in these situations where we need you. So thank you and thank your partners. That concludes court for the day. So we will reconvene tomorrow morning at 9 o'clock.